**Quentin HEDRICK, Appellant,**

v.

**DAIKO SHOJI CO., LTD., OSAKA, and Pine Oak Shipping, S.A., et al., Appellees.**

**Nos. 81–3588, 81–3597 and 82–3399.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 8, 1982.

Decided Sept. 13, 1983.

Raymond J. Conboy, Portland, Or., for appellant.

Paul N. Wonacott, Albert J. Bannon, Portland, Or., for appellees.

Before GOODWIN, PREGERSON and CANBY, Circuit Judges.

GOODWIN, Circuit Judge.

Quentin Hedrick, a longshoreman injured on the job, appeals a judgment n.o.v. in favor of the defendant ship, and a judgment dismissing his claim for want of jurisdiction against the foreign manufacturer of a defective wire-rope splice that gave way and caused his injury.

The judgment n.o.v. in favor of the ship raises important questions about the residual liability of the ship for its own negligence following the 1972 revisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901, *et seq.* The dismissal for want of jurisdiction requires a close examination of *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) and *Raffaele v. Compagnie Generale Maritime,* 707 F.2d 395 (9th Cir.1983).

Hedrick was severely and permanently injured when a defective splice in a wire rope pulled loose, allowing a ship's boom to sweep out of control and hit him. The splice was manufactured by Daiko Shoji Co., Ltd. of Osaka, Japan ("Daiko"). Hedrick was working aboard the Cressida, owned and operated by Pine Oak Shipping, S.A., a Japanese corporation.

The defective splice formed the eye of a vang pendant, a steel cable on which was suspended the counter-weight for the ship's boom and tackle. The vang pendant was never subject to more stress than that put on it by the counter-weight. The pendant had been in use for several months before the accident occurred. When the splice gave way, a cargo block hook and rigging struck Hedrick.

Daiko admitted that it spliced the wire pendant that failed. Daiko admitted that it is in the business of splicing wires used on ocean-going ships, and annually splices approximately 300,000 pieces of wire.

The district court granted Daiko's motion to quash service of summons and dismissed the claim against Daiko on the ground that the court did not have personal jurisdiction over Daiko. The court ruled that the "arrival of the cables in Oregon was completely fortuitous. This was Daiko's only known contact with Oregon. And, absent any other contact with Oregon, the due process requirements for personal jurisdiction for an out-of-state defendant are not satisfied."

The jury returned a verdict finding Pine Oak negligent, and awarded damages of $971,394.40. The court granted Pine Oak's motion for judgment notwithstanding the verdict. *Hedrick v. Pine Oak Shipping Co.,* 531 F.Supp. 27 (D.Or.1981).

### I. *Liability of the Ship*

Plaintiff and Pine Oak agree that the splice was defective and that it was covered by serving marline (rope wrapping). The defective splice had been installed by the ship in reliance upon the manufacturer and without inspection, apart from visual examination of the covered splice. There was no testimony that proper inspection of a splice purchased from a reliable seller required

the buyer to remove the marline and look underneath the covering. There was testimony that no one had ever heard of a splice pulling out under the circumstances described in this case. The trial court decided that there was no evidence of negligence on the part of the vessel, and that it had been a mistake to submit the question of negligence to the jury.

In concluding that there was no evidence of negligence, the court ignored Hedrick's evidence that the defective splice could have been visible even under the serving marline had Pine Oak inspected it. One witness testified that even if an eye splice were covered with serving marline, loosening of the splice would be apparent to someone looking at the throat of the splice. The General Superintendent and Safety Engineer for Brady-Hamilton Stevedore Company testified that impending failure of the splice could be observed because the tucks would visibly "hump up," even under a serving marline.

Witnesses also testified that serving marline is no longer in customary use and that it is a bad safety practice to cover splices with it. Hedrick countered testimony that it was good seamanship to use serving marline to protect the metal and its lubrication from salt water damage with other testimony that serving marline serves no useful purpose and makes it difficult to inspect splices, entraps sea water and causes corrosion of the wire. One witness said that serving marlin on vang pendants is worse than useless.

■ Given conflicting testimony about the utility of the serving marline and its effect in concealing a possible latent defect, it was the jury's duty to decide whether the vessel was at fault under standard rules of the law of negligence. Judgment n.o.v. is proper only if the evidence was such that no reasonable person would accept it as adequate to establish the existence of each fact essential to liability. *Turner v. Japan Lines, Ltd.,* 651 F.2d 1300, 1304 (9th Cir. 1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 294, 74 L.Ed.2d 278 (1982). We find in the record evidence from which a reasonable juror could find that Pine Oak could have inspected the splice and learned that it was defective before the accident occurred.

In *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), a longshoreman was injured by falling cargo when a malfunctioning winch slipped. The longshoreman's stevedore employer knew of the defect in the winch but had been using it for two days before the accident and had not informed the shipowner. The Supreme Court affirmed this court's reversal of the district court's summary judgment for the shipowner, holding that there was a triable issue whether the shipowner had actual knowledge or was reasonably chargeable with knowledge of the defective winch. The Court noted that the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b), abolished the longshoreman's right to recovery for unseaworthiness, but preserved his right to recover for negligence. 451 U.S. at 164–66, 101 S.Ct. at 1620–21.

Where the shipowner itself supplies equipment, it has a duty to inspect the equipment before turning it over for use by the stevedore. *Scindia, supra.* Here it was a jury question whether an inspection would have revealed the defective splice, and whether the shipowner's breach of its duty to inspect its own equipment was therefore a proximate cause of the accident. Therefore the district court erred in granting judgment n.o.v.

## II. *Long Arm Jurisdiction*

■ In determining whether a court has personal jurisdiction over a defendant, we use a two-step analysis. *Raffaele,* 707 F.2d at 396. We first apply the forum state's long-arm statute and then consider whether its application comports with due process requirements. *Taubler v. Giraud,* 655 F.2d 991, 993 (9th Cir.1981). As Oregon's long-arm statute, Or.R.Civ.P. 4, confers jurisdiction "to the outer limits" of due process, *State ex rel. Michelin v. Wells,* 294 Or. 296, 657 P.2d 207 (1982); *State ex rel. Hydraulic Servocontrols v. Dale,* 294 Or. 381, 657 P.2d 211 (1982), we need consider

only the second step here. *See Raffaele,* 707 F.2d at 396. We must decide whether Daiko's contacts with Oregon justify jurisdiction over Daiko for the purposes of this action. *See Internat. Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *Data Disc, Inc. v. Systems Tech. Assoc., Inc.,* 557 F.2d 1280, 1287 (9th Cir.1977). The minimal contacts requirements of constitutional due process are met when: (1) a nonresident defendant performs some act by which it avails itself of the benefits and protections of the forum's laws; (2) the claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction is reasonable. *Raffaele,* 707 F.2d at 397; *Data Disc,* 557 F.2d at 1287.

■ Daiko performed a forum-related act when it produced a splice that it knew was destined for ocean-going vessels serving United States ports, including those of Oregon. Hedrick's claim resulted from the forum-related act. In *World-Wide Volkswagen v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), the "fortuitous" accident in Oklahoma of a car sold in New York did not provide sufficient connection with Oklahoma "such that [the New York seller] should reasonably anticipate being haled into court there." *Id.* at 297, 100 S.Ct. at 567. In *World-Wide Volkswagen,* however, the Court noted that in cases where a defendant delivers its products into the stream of commerce with the expectation that they will reach the forum state, "the forum's court may assert personal jurisdiction." *Id.* at 297–98, 100 S.Ct. at 257. Daiko's provision of the splice for an ocean-going ship resembled the delivery into the stream of commerce of the defective valve in *Gray v. American Radiator & Standard Sanitary Corp.,* 22 Ill.2d 432, 176 N.E.2d 761 (1961), cited with approval in *World-Wide Volkswagen,* 444 U.S. at 298, 100 S.Ct. at 257.

Daiko produces over 300,000 splices per year, many of them for ocean-going vessels. Daiko, though it produces its splices only in Japan, manufactures for a world-wide market and provides splices for ships that serve world ports. The splice caused an injury to Hedrick in a port that was within the expected service area of Daiko's customers. By contrast, in *World-Wide Volkswagen* the distributor served a market limited to three states of the northeastern United States. Provision of a part to an ocean-going common carrier is different from the sale of an automobile to a private party. The probability that the part sold to an ocean carrier will be used in a foreign port is not fortuitous. It is certain. *See DeJames v. Magnificence Carriers, Inc.,* 654 F.2d 280, 290–93 (3d Cir.) (Gibbons, J., dissenting), *cert. denied,* 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981).

Finally, to satisfy the third test in *Raffaele,* the exercise of jurisdiction must be reasonable. This court's first study of the reasonableness of long-arm jurisdiction after *World-Wide Volkswagen* came in *Ins. Co. of North America v. Marina Salina Cruz,* 649 F.2d 1266 (9th Cir.1981). In that case we denied long-arm jurisdiction in Alaska over a Mexican shipyard that had performed work on a fishing vessel at the request of Seattle owners. When the vessel sank in Alaskan waters, allegedly as a result of modification work improperly done in Mexico, the owner's insurer sued in the district of Alaska. We held, in a point-by-point analysis of the various factors outlined in *World-Wide Volkswagen,* that on the facts of that case a Mexican shipyard could not reasonably be sued in Alaska.

■ This is a products liability case. A manufacturer or supplier of a defective product who knew or should have known that a product would enter the stream of foreign commerce can be subjected, consistently with due process, to a forum state's long-arm jurisdiction and be sued in the forum where the injury occurred.

As we noted in *Raffaele,* our opinion in *Ins. Co. of North America v. Marina Salina Cruz,* 649 F.2d 1266, 1270 (9th Cir.1981), set

out a partial list of seven factors pertinent to the reasonableness inquiry. These factors are not mandatory tests, each of which a plaintiff must pass in order for a court properly to assume jurisdiction. Instead, the factors illuminate the considerations of fairness and due process set forth in *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158.

An application of these factors to this case reveals that it would be reasonable to subject Daiko to the jurisdiction of an Oregon court. While Daiko's purposeful interjection of its activities into Oregon was not extensive, the company sent a defective product into the world market with knowledge that harm could occur wherever a defect should manifest itself. Second, while Daiko's burden in defending an action in Oregon is significant, Hedrick's burden in suing Daiko in Japan exceeds that of Daiko in defending a suit in Oregon. Third, Oregon has a compelling interest in regulating the conduct of manufacturers who expose Oregon longshoremen to the hazards of defective products in Oregon ports. The impact of Hedrick's permanent injuries will be felt in Oregon. Fourth, Daiko has shown no conflict with any sovereign interests of Japan sufficient to outweigh Oregon's interest in litigating Hedrick's claim. Fifth, Oregon appears to be the most efficient forum to resolve the dispute. Much of the evidence must be gathered in Oregon because the accident occurred there and most of the witnesses to it live there. Oregon law would likely control. *See Rocke v. Canadian Auto. Sport Club,* 660 F.2d 395, 399–400 (9th Cir.1981). Sixth, availability of an Oregon forum is important to Hedrick's chances for convenient and effective relief. Seventh, while a Japanese forum might be available, we cannot say that it represents a practical alternative for an injured Oregon longshoreman. *See Turner v. Japan Lines, Ltd.,* 651 F.2d at 1304. The balance of equities and the factors outlined above indicate that the exercise of jurisdiction over Daiko Shoji by a federal district court in Oregon is reasonable. Therefore the dismissal of Daiko Shoji as a defendant was error.

### III. Comparative Negligence

Oregon's comparative negligence statute states that joint tortfeasors shall be liable in proportion to their respective percentages of the common negligence of all tortfeasors.[1] Because Daiko was improperly dismissed as a defendant, the trier of fact has not determined what percentage of the negligence, if any, was Daiko's. The court's apportionment of damages between Pine Oak and Daiko cannot be carried out without a new trial, because Daiko has had no opportunity to defend itself at trial against Hedrick's claims.

The district court's orders are vacated and the case is remanded for a new trial.

---

1. O.R.S. 18.440:
   "*Right of contribution among joint tortfeasors; limitations; subrogation of insurer; effect on indemnity right.*
   "(1) Except as otherwise provided in this section, where two or more persons become jointly or severally liable in tort for the same injury to person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them. There is no right of contribution from a person who is not liable in tort to the claimant."
   O.R.S. 18.445:
   "*Basis for proportional shares of tortfeasors.*
   "(1) The proportional shares of tortfeasors in the entire liability shall be based upon their relative degrees of fault or responsibility.... [T]he proportional share of a tortfeasor in the entire liability shall be based upon his percentage of the common negligence of all tortfeasors."
   O.R.S. 18.450:
   "(6) The recovery of a judgment for an injury or wrongful death against one tortfeasor does not of itself discharge the other tortfeasors from liability for the injury or wrongful death unless the judgment is satisfied. The satisfaction of the judgment does not impair any right of contribution.
   "(7) The judgment of the court in determining the liability of the several defendants to the claimant for an injury or wrongful death shall be binding as among such defendants in determining their right to contribution."